# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 26, 2018

No. 16-20663

Lyle W. Cayce
Clerk

SAMUEL GIANCARLO, Individually and on behalf of all others similarly situated; CARLOS ALSINA, Medical Doctor,

      Plaintiffs - Appellants

v.

UBS FINANCIAL SERVICES, INCORPORATED; UBS SECURITIES, L.L.C.; UBS AG; UBS O'CONNOR, L.L.C.,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:03-CV-4359

Before DENNIS, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:*

This putative securities class action stems from the collapse of the energy-and-commodities giant, Enron Corporation. Plaintiffs, Enron investors, allege that Defendants, entities comprising the investment bank UBS, were complicit in structuring financial vehicles to enable Enron to mislead the public as to its fiscal performance. Plaintiffs claim that

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-20663

Defendants learned through their commercial relationships with Enron that Enron's prospects were poor. They further allege that Plaintiffs purchased Enron debt using one of the defendants as a broker because of Defendants' failure to disclose material information about Enron's instability.

The district court dismissed Plaintiffs' amended complaint for failure to state a claim. On appeal, Plaintiffs argue that their amended complaint sufficiently pled violations of federal securities law and, in the alternative, that it was error for the district court to dismiss their claims on the basis of the first amended complaint, filed in 2006, as the court should have granted Plaintiffs' 2011 motion for leave to file a proposed second amended complaint.

Plaintiffs have failed to establish that Defendants' knowledge and actions can be aggregated for purposes of assessing liability, which, due to the nature of their factual allegations and legal arguments, is fatal to their claims. As for their motion for leave to amend, Plaintiffs have not shown that they were diligent, given their unexplained years-long delay, or that their proposed amendments were important. For these reasons, as explained more fully below, we AFFIRM the district court's judgment of dismissal.

**I**

Defendants UBS Financial Services, Inc. (formerly known as UBS PaineWebber, Inc., and referred to herein as PaineWebber), UBS Securities LLC (formerly known as UBS Warburg, LLC, and referred to herein as Warburg), and UBS AG are related but distinct corporate entities.[1] Together they constitute "UBS," one of the largest banks in the world. Defendants had several important professional connections with Enron, once the world's seventh-largest corporation by revenue. According to Plaintiffs' complaint, by

---

[1] PaineWebber and Warburg are, or were at the relevant times, subsidiaries of UBS AG.

2

2000, Enron had begun "to seriously manipulate [its] financials" so as to make the company appear more robust than it was. As relevant here, Enron and the UBS entities engaged in a series of transactions Plaintiffs characterize as part of Enron's "financial chicanery." The complaint discusses multiple "off-balance[-]sheet" transactions between Defendants and Enron and alleges that each of these transactions was, in reality, a loan from the Defendants to Enron that was structured in a manner that permitted Enron to avoid logging the transaction as a liability.

In August 2001, Enron's Chief Executive Officer announced his retirement, which was followed by a precipitous drop in Enron's share price. Plaintiffs allege that Defendants immediately began to unwind their financial entanglements with Enron and to sell off their own Enron investments. By November 2001, Enron was making a series of financial disclosures and restatements, had placed its Chief Financial Officer (CFO) on a leave of absence, and had announced an internal investigation. Enron filed for bankruptcy in December 2001.

Plaintiffs are former PaineWebber clients who bought Enron bonds or other debt instruments using PaineWebber as their broker. Plaintiffs' basic theory of liability is that Defendants knew of Enron's financial manipulations and impending demise and owed Plaintiffs a duty to disclose such knowledge. In 2002, a multidistrict litigation (MDL) was established for the purpose of coordinating all cases "concerning allegedly negligent and/or fraudulent conduct relating to the financial collapse of Enron." The instant case was filed in 2003 and was transferred to the MDL to coordinate pretrial proceedings in early 2004. After the conclusion of fact discovery in 2006, Plaintiffs elected to proceed independently from the class certified in "*Newby*," a case involving claims by purchasers of Enron stock against banks that allegedly facilitated

No. 16-20663

Enron's misrepresentation of its financial condition.  *See Regents of the Univ. of Cal. v. Credit Suisse First Bos.*, 482 F.3d 372, 377 (5th Cir. 2007).

Plaintiffs filed their first amended complaint in August 2006.  Plaintiffs alleged, in pertinent part, that Defendants violated § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, by failing to disclose information tending to show that Enron's financial state was precarious.  Defendants filed a motion to dismiss in September 2006, arguing, inter alia, that although Warburg and PaineWebber were distinct legal entities, "[P]laintiffs [made] essentially no attempt to plead, with the requisite specificity, who at what defendant had what knowledge or wrongful intent."  Plaintiffs filed a response, incorporating a boilerplate motion for leave to amend in the event the trial court found the complaint deficient.  Briefing was completed in January 2007.

In March 2007, this court decertified the class in *Newby*.  *See Regents*, 482 F.3d at 394.  The following day, the district court stayed proceedings in *Newby* and most other coordinated and consolidated cases in the Enron MDL. In April 2007, Plaintiffs requested a determination that the stay order did not apply to their case.  In June 2007, the trial court confirmed that the stay order *did* apply to Plaintiffs' case and that it was in effect pending potential certiorari in *Newby* and the Supreme Court's then-pending decision in *Stoneridge Investment Partners, L.L.C. v. Scientific Atlanta, Inc.*, 552 U.S. 148 (2008), which addressed aiding and abetting liability under § 10(b).

In January 2008, the Supreme Court decided *Stoneridge* and, separately, denied certiorari in *Newby*.  *See Regents of the Univ. of Cal. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 552 U.S. 1170 (2008); *Stoneridge*, 552 U.S. 148.[2]

---

[2] The district court granted summary judgment in *Newby* in early March 2009.  *See Newby v. Enron Corp. (In re Enron Corp. Secs.)*, 610 F. Supp. 2d 600 (S.D. Tex. 2009).

4

No. 16-20663

Two years later, Plaintiffs forwarded a copy of their proposed second amended complaint to Defendants. In July 2010, Plaintiffs filed a motion to lift the stay in their case. Over a year later, the court lifted the stay, and one week after that, Plaintiffs filed a motion for leave to file their second amended complaint. In March 2012, the district court denied leave to amend "in light of the long history of deadlines and extensions in the *Newby* action."

Over four years later, in August 2016, the district court granted Defendants' motion to dismiss. The court found that Plaintiffs failed to plead facts demonstrating that Defendants' separate corporate status should be disregarded, and thus Plaintiffs had failed to adequately plead their "single, fully integrated entity theory" of liability. The court held that Plaintiffs' allegations were insufficient to support a duty to disclose on the part of UBS AG or Warburg, finding that the amended complaint contained no factual allegations showing a direct relationship between Plaintiffs and Warburg or UBS AG that would give rise to a duty of disclosure. The court further held that, although PaineWebber owed some duties to Plaintiffs as retail brokerage clients, PaineWebber had not breached its limited duties. The court also held that Plaintiffs failed to sufficiently allege PaineWebber's scienter inasmuch as they failed "to identify specific brokers and allege facts that demonstrate each had an intent to deceive, manipulate or defraud or acted with severe recklessness." Finally, the court held that Plaintiffs failed to establish that PaineWebber's alleged brokerage practices caused their losses, reasoning that PaineWebber's actions in no way related to Enron's fraud, which was the actual cause of Plaintiffs' economic damages.[3]

---

[3] The court also dismissed Plaintiffs' claims under 15 U.S.C. § 78t-1(a), a provision concerned with insider trading. Plaintiffs do not make any arguments related to this holding on appeal and therefore have abandoned any such arguments. *See, e.g.*, *United States v.*

No. 16-20663

Plaintiffs filed a motion for reconsideration, arguing that the court erred in denying leave to amend their complaint and in finding that Plaintiffs failed to adequately plead their § 10(b) claims. The district court denied reconsideration. Plaintiffs filed a notice of appeal designating specifically, and only, the district court's order granting Defendants' motion to dismiss.

## II

We review the sufficiency of a complaint de novo. *Ind. Elec. Workers' Pension Tr. Fund Ibew v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). "The plaintiff's well-pleaded facts are to be accepted as true and viewed in the light most favorable to her." *Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507, 510 (5th Cir. 2016). "[C]onclusory allegations, unwarranted deductions[, and] legal conclusions" are not "well-pleaded facts" for purposes of evaluating a complaint. *See Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 361 (5th Cir. 2004). When deciding a motion to dismiss a claim for securities fraud, a court may consider the contents of certain public documents filed with the Securities and Exchange Commission (SEC), *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996), and "documents that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim," *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

Where fraud is alleged, Federal Rule of Civil Procedure 9(b) "creates a heightened pleading requirement that 'the circumstances constituting fraud or mistake shall be stated with particularity.'" *United States ex rel. Rafizadeh v.*

---

*Charles*, 469 F.3d 402, 408 (5th Cir. 2006) ("Inadequately briefed issues are deemed abandoned.").

*Cont'l Common, Inc.*, 553 F.3d 869, 872 (5th Cir. 2008) (quoting FED. R. CIV. P. 9(b)). "[A]lthough the requirement for particularity in pleading fraud does not lend itself to refinement, . . . directly put, the who, what, when, and where must be laid out." *Southland*, 365 F.3d at 363 (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002)). A class-action complaint alleging a violation of § 10(b) must allege fraud in accordance with the heightened pleading standard of Rule 9(b). *See id.*

### III

To state a securities-fraud claim under § 10(b) and Rule 10b-5, Plaintiffs must allege that Defendants engaged in deceptive conduct in connection with the purchase or sale of securities, that such conduct was committed with scienter, that Plaintiffs acted in reliance on Defendants' conduct, and that the conduct caused Plaintiffs' losses. *See, e.g.*, *Dura Pharm., Inc. v. Brando*, 544 U.S. 336, 341–42 (2005). Plaintiffs' allegations regarding deceptive conduct, scienter, and reliance are interlinked inasmuch as Plaintiffs rest their case on the presumption announced in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). In *Affiliated Ute,* the Supreme Court held that, in the case of an alleged material nondisclosure, reliance can be presumed from the materiality of the omission. *Id.* at 153–154. To invoke the "*Affiliated Ute* presumption," Plaintiffs must allege a claim based on material omissions or non-disclosure and must show that Defendants owed them a duty of disclosure. *See Regents*, 482 F.3d at 384. In order to evaluate these issues, we must first address Plaintiffs' contention that Defendants formed a joint venture, which,

they claim, permits us to aggregate Defendants' knowledge and actions for purposes of assessing liability.

## A

Plaintiffs' amended complaint generally refers to Defendants as if they were a single entity. On appeal, Plaintiffs argue that we can attribute each defendant's actions and knowledge to a single entity called "UBS" because Defendants formed a "de facto joint venture." Plaintiffs claim that their allegations are supported by Defendants' SEC filings, which included statements referring to Defendants as an "integrated investment services firm," referring to "UBS's business groups," and calling UBS "an integrated group."

Plaintiffs argue that, under Delaware law, the "generally recognized" factors relevant to determining whether a joint venture exists are: "(1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, (5) a duty to share in the losses which may be sustained." *Warren v. Goldinger Bros., Inc.*, 414 A.2d 507, 509 (Del. 1980) (quoting *Kilgore Seed Co. v. Lewin*, 141 So. 2d 809, 810–11 (Fla. App. 1962)).[4] Plaintiffs fail to explain how the allegations identified in their brief on appeal support finding a joint venture under this test. None of the allegations allude to profit sharing, or loss sharing, *see N.S.N. Int'l Indus., N.V. v. E.I. DuPont de Nemours & Co., C.A.*, No. 12902, 1994 Del. Ch. LEXIS 46, at *20–21 (Del. Ch. Mar. 31, 1994) (no joint venture where agreement between parties did not contemplate loss sharing), and none establish that the Defendants have a joint

---

[4] Plaintiffs' brief suggests in a footnote that federal common law or Texas law is relevant to our analysis of whether a joint venture exists, but otherwise exclusively relies on Delaware law. Plaintiffs also contended at oral argument that Delaware law governs, so we will assume this is the case.

right to control the purported joint venture,[5] *see In re Del. Bay Surgical Servs.*, No. 2121-S, 2002 Del. Ch. LEXIS 158, at *8 (Del. Ch. Jan. 28, 2002) (no joint venture where parties did not have joint right of control). Plaintiffs' allegations—principally references to Defendants' vague corporate platitudes about their integration as a firm—may logically support that Defendants shared a community of interest in their business activities, but this alone is insufficient to support joint venture liability. *See, e.g.*, *Warren*, 414 A.2d at 509 (five factors "must be" present); *In re Coffee Assocs.*, No. 12950, 1993 Del. Ch. LEXIS 263, at *15 (Del. Ch. Dec. 3, 1993) ("A community of economic interest . . . . is not sufficient to create a joint venture."). Thus, Plaintiffs have not established the existence of a joint venture, and they have not put forth any other theory that permits us to aggregate the actions and knowledge of the defendant entities for purposes of assessing liability.

**B**

Plaintiffs contend that Defendants were in possession of material, non-public information and that Defendants owed Plaintiffs a duty to disclose this information. Specifically, Plaintiffs allege that Defendants ought to have disclosed "UBS's knowledge that Enron's public financial statements were manipulated and materially misleading."[6] However, Plaintiffs have not sued

---

[5] We note that, at oral argument, Plaintiffs alluded to additional supportive allegations in Defendants' public SEC filings and Plaintiffs' proposed second amended complaint. Our present analysis is limited to the first amended complaint. Moreover, we ordinarily do not consider points raised for the first time at oral argument. *See Vargas v. Lee*, 317 F.3d 498, 503 n.6 (5th Cir. 2003). Federal Rule of Appellate Procedure 28(a)(8) requires appellants to brief their arguments and to support their contentions with citations to the record. Although Plaintiffs are correct that we can consider certain documents filed with the SEC, it is Plaintiffs' burden to point us to relevant portions of the relevant filings in their briefing.

[6] For reasons made clear below, we have no occasion to decide whether Plaintiffs' allegations plausibly support that Defendants knowingly or recklessly participated in Enron's fraud. We assume, arguendo, that the transactions Plaintiffs detail in their amended

any entity called "UBS," or, as previously discussed, established that any such legal entity exists. It is, therefore, not sufficiently particular to allege that "UBS" knew material non-public information due to "UBS's" interactions with Enron. *See Southland*, 365 F.3d at 363 (heightened pleading requires plaintiff to, at minimum, allege "who" engaged in deceptive conduct). *Cf. Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 289 (5th Cir. 2006) (allegations not sufficiently particular where they failed to demonstrate which specific defendants of a group of defendants had the duty to disclose information). Moreover, even a searching review of the relevant documents supports, at most, that Warburg and UBS AG had some insider knowledge of Enron's financial situation, as those are the defendants that participated in the transactions identified by Plaintiffs.[7] Thus, Plaintiffs must show that Warburg or UBS AG owed them a duty of disclosure.

Plaintiffs point to several supposed sources of Defendants' duty of disclosure. Plaintiffs first argue that, under applicable self-regulatory organization rules, "UBS had an affirmative duty to disclose its knowledge concerning Enron's financial manipulations to its retail clients who were placing orders with UBS to purchase Enron securities." However, Plaintiffs do not divulge in their brief what rules they are referring to, or how such rules imposed a duty of disclosure on any of the Defendants. Plaintiffs' amended

---

complaint were sufficient to impart material, non-public knowledge to the participating defendants.

[7] To the extent Plaintiffs sufficiently allege that any individual employee or officer at one of the defendant corporations possessed material, non-public information regarding Enron's finances, we might be able to impute that knowledge to a particular defendant. But Plaintiffs fail to indicate which individuals work for which defendant. We will not strain to come up with a theory of each defendant's knowledge when Plaintiffs have offered none in their briefing. *Cf. United States v. Caldwell*, 302 F.3d 399, 421 n.19 (5th Cir. 2002) ("Because Caldwell fails to provide any supporting analysis for this claim, we consider it abandoned as inadequately briefed.").

complaint appears to only discuss the role of self-regulatory organization rules in one paragraph, and the only rule specifically discussed is a National Association of Securities Dealers (NASD) rule requiring that

> [a]ll member communications with the public shall be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts in regard to any particular security or securities or type of security, industry discussed, or service offered. No material fact or qualification may be omitted if the omission, in the light of the context of the material presented, would cause the communications to be misleading.

This rule does not appear to impose a duty of disclosure in the absence of a "communication[]." The only defendant alleged to have "communicated" with Plaintiffs is PaineWebber, and Plaintiffs have not sufficiently alleged that any person at PaineWebber had knowledge concerning Enron's financial manipulations. Thus, even if we accepted Plaintiffs' invitation to hold that NASD rules can impose a duty of disclosure for purposes of § 10(b) liability,[8] Plaintiffs have not shown that any defendant violated such rules.[9]

Next, Plaintiffs rely on *Affiliated Ute* for the proposition that Defendants' "special relationship" with Plaintiffs gave rise to a fiduciary-like duty of disclosure. Plaintiffs first allege that "UBS gained significant amounts of material, non-public information concerning Enron, its finances, and its practices via . . . numerous interactions and overlapping relationships" with Enron. This purported "special relationship" is, in fact, just an argument that insider knowledge itself gives rise to a duty of disclosure, an argument that the

---

[8] We have previously declined "to address the existence of a private cause of action under the [New York Stock Exchange] and NASD rules." *Jolley v. Welch*, 904 F.2d 988, 993 (5th Cir. 1990).

[9] Additionally, Plaintiffs repeatedly contend that their claims are not based on any statements, so it is unclear how an NASD rule governing communications supports their theory of liability.

Supreme Court has rejected. *See Chiarella v. United States*, 445 U.S. 222, 230 (1980) ("[A] duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information."). And, to the extent Plaintiffs rely on allegations as to Defendants' active participation in Enron's misleading financial transactions, this court has already held that such behavior is not sufficient to establish a duty of disclosure. *See Regents*, 482 F.3d at 384–85.

Next, Plaintiffs allege that a duty to disclose arose from the fact that "UBS was entirely familiar with the prevailing market for Enron shares at all material times"; "UBS was a market maker[10] for Enron and its related businesses," based on participation in financial transactions with Enron; "UBS itself traded Enron securities in the world's securities markets via UBS accounts"; and "UBS took advantage of its access to and significant knowledge of Enron's secret financial reality, eliminated its own risk by selling its Enron holdings in the months prior to Enron's bankruptcy, and even created UBS securities tied to Enron's default as part of that process."

The only authority Plaintiffs cite in support of this "special relationship" is *Affiliated Ute*. In *Affiliated Ute*, plaintiffs, owners of restricted stock, alleged that two bank officers bought their stock without disclosing that they had created a secondary market in which the stock would be resold at a significant profit. *See* 406 U.S. at 133–39, 144–47. The bank, which was the exclusive transfer agent for the stock, had agreed to act on behalf of the individual stockholders. *Id.* at 145, 152. The Court held that the bank officers had committed securities fraud because they had "devised a plan and induced the [sellers] to dispose of their shares without disclosing to them material facts

---

[10] "A market maker is a broker-dealer firm that assumes the risk of holding a certain number of shares of a particular security in order to facilitate the trading of that security." *Market maker*, INVESTOPEDIA, http://www.investopedia.com/terms/m/marketmaker.asp.

that reasonably could have been expected to influence their decisions to sell," namely that "the defendants were in a position to gain financially from their sales and that their shares were selling for a higher price in th[e] market" that the defendants had created. *Id.*

Plaintiffs' relationship to Defendants is not analogous to that of the parties in *Affiliated Ute*. In contrast to *Affiliated Ute*, there were "other market makers and underwriters" trading in Enron securities and Plaintiffs were not required to deal with any of the Defendants. More importantly, Plaintiffs have not successfully alleged that the defendants who engaged in market-making activities (UBS AG or Warburg) sold them securities. Documents attached to the pleadings discuss the role of "UBS Warburg AG" in several transactions and indicate that that "UBS Warburg" was the "joint lead manager of Credit Linked Notes for Enron." Plaintiffs specify that their brokers were employees of PaineWebber. Plaintiffs do not argue that PaineWebber had any special knowledge of the market for Enron debt securities, and UBS AG's and Warburg's dealings with Enron cannot support that PaineWebber had a duty of disclosure.

Finally, Plaintiffs argue that their retail relationship with Defendants gave rise to a duty of disclosure. But, again, even assuming that Plaintiffs' retail relationship with PaineWebber gave rise to a duty of disclosure, Plaintiffs have not demonstrated that PaineWebber had any material, non-public knowledge to disclose. Thus, Plaintiffs have failed to establish that any one defendant had material non-public knowledge and a duty to disclose this knowledge to Plaintiffs. Accordingly, the district court properly dismissed Plaintiffs' amended complaint for failure to state a claim.

No. 16-20663

## IV

Plaintiffs argue that, even if their first amended complaint was properly dismissed for failure to state a claim, the district court ought not to have dismissed the action without granting them leave to file a second amended complaint. Plaintiffs sought leave to amend their complaint long after the time to amend had expired and Defendants' motion to dismiss was fully briefed. The district court denied leave to amend "in light of the long history of deadlines and extensions in the *Newby* action."

As a preliminary matter, Defendants argue that Plaintiffs have not properly appealed the denial of leave to amend because their notice of appeal only, and specifically, designated the district court's order granting the motion to dismiss. However, Defendant's construction of Federal Rule of Appellate Procedure 3—which governs the required content of a notice of appeal—is formalistic in a manner that we have already rejected.

In *New York Life Insurance Co. v. Deshotel*, 142 F.3d 873, 884 (5th Cir. 1998), an appellee argued that, because the notice of appeal only designated the order dismissing the action, we lacked jurisdiction over the appellant's challenge to an earlier district court order denying her motion to remand. We rejected the appellee's argument because (1) the order designated in the notice of appeal was the final judgment, and therefore the notice preserved all prior orders intertwined with that judgment; (2) the issues in the final order were "inextricably intertwined" with the prior order inasmuch as the final judgment was predicated on the district court's exercise of removal jurisdiction; and (3) any doubts as to the appellant's intent to preserve her arguments on appeal were resolved by the opening brief, which addressed such arguments. *Id.* We therefore concluded that "the notice of appeal coupled with the opening briefs gave [the appellee] adequate notice" of the matters at issue in the appeal and

that the appellee "fail[ed] to demonstrate that it was prejudiced by any deficiency in the notice of appeal." 816 F.3d at 328.

Defendants argue that the order designated here was not a "final judgment" because the notice of appeal designates only the August 2, 2016 dismissal order and not the docket entry administratively terminating the case. But that docket entry reflects that the case was "[t]erminated per" the "opinion and order of dismissal" specifically designated by the Plaintiffs. Intent to appeal the conclusive order can be inferred from Plaintiffs' notice of appeal and the opening brief, *see Deshotel*, 142 F.3d at 884, and review of that order "clearly encompasses the prior orders leading up to it," *see Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 349 (5th Cir. 1989). Defendants have fully addressed the motion for leave to amend on the merits and fail to argue that they were prejudiced by Plaintiffs' inartful notice of appeal. Consequently, we are satisfied that we have jurisdiction over this issue, the merits of which we now turn to address.

"While Federal Rule of Civil Procedure 15(a) provides that leave to amend shall be 'freely' given, [Federal] Rule [of Civil Procedure] 16(b)(4) limits modifications to a scheduling order to situations where good cause is shown." *United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 328 (5th Cir. 2016). Four factors are relevant to whether good cause has been shown for purposes of Rule 16(b)(4): "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Id.* (cleaned up). The district court has broad discretion in considering whether to grant an untimely motion for leave to amend. *See Fahim v. Marriott Hotel Servs.*, 551 F.3d 344, 348 (5th Cir. 2008).

No. 16-20663

Plaintiffs argue that the district court abused its discretion by denying leave to amend. They claim that they failed to timely amend their complaint (1) because they needed to add information from the deposition of Enron CFO Andrew Fastow; (2) because of their "desire to include allegations based upon UBS's expert witness testimony"; and (3) because Defendants' disavowal of the UBS joint venture was unforeseeable. Plaintiffs argue that their amendments are "[c]learly" important, in light of the district court's dismissal. Plaintiffs contend that there is no evidence that the amendment would result in prejudice to Defendants. Plaintiffs further argue that they themselves caused no delay, so the district court's explanation for denying leave—delay in the *Newby* case—was unjustified.

Plaintiffs' explanations for their failure to timely amend their complaint do not explain their long delay in seeking leave to amend, nor establish their diligence. *See Fahim*, 551 F.3d at 348 (under Rule 16(b), a party must show that "the deadlines cannot reasonably be met despite the diligence of the party needing the extension"). First, Fastow was deposed in October 2006. This case was not stayed until March 2007, and Plaintiffs did not concede that their action was stayed until June 2007. Plaintiffs had at least four months before their action was stayed to request leave to amend to incorporate the Fastow deposition. Nonetheless, Plaintiffs did not send Defendants a copy of their proposed amended complaint until January 2010. By that time, they had known of Fastow's deposition for over four years, and the basis for the stay had been fully resolved for at least nine months. *See Newby*, 610 F. Supp. 2d at 655. Consequently, Fastow's October 2006 deposition does not explain Plaintiffs' delay.

Second, as to the "UBS expert testimony" Plaintiffs added to their proposed second amended complaint, three of the cited depositions were taken

16

months before Plaintiffs' first amended complaint was filed. The one that was not occurred in November 2006. Plainly, then, these depositions do not explain Plaintiffs' delay.

Third, Plaintiffs suggest that they were caught off-guard by Defendants' disavowal of the "UBS joint venture." But Plaintiffs should have known of Defendants' position by September 2006, at which time Defendants filed their motion to dismiss highlighting that Warburg and PaineWebber were separate legal entities and arguing that Plaintiffs had not shown scienter because Plaintiffs made "essentially no attempt to plead, with the requisite specificity, who at what defendant had what knowledge or wrongful intent." Plaintiffs failed to take any concrete steps to amend their complaint with this information until 2010. Therefore, Plaintiffs have failed to demonstrate that they were diligent in seeking leave to amend.

In any event, Plaintiffs have failed to demonstrate the need for the amendments. In a single line, Plaintiffs contend that their amendments were important in light of "the dismissal and the extent to which it is the correct legal decision." But Plaintiffs do not explain what additional allegations would cure which deficiencies, and the correlation is not self-evident. Elsewhere in their briefing, Plaintiffs imply that Fastow testified that he told Defendants that Enron was in poor financial shape and hid it through intentionally misleading manipulation. Even if this were the case, Plaintiffs do not argue that Fastow had any dealings with PaineWebber specifically and therefore have not shown how these additional allegations would resolve the earlier-discussed inability to attribute insider knowledge to PaineWebber. Plaintiffs also contend, generally, that their additional allegations would "bolster the joint venture allegation," but fail to explain how they would do so. Similarly, they argue that allegations based on "UBS's expert witness testimony [would]

17

support[] the[ir] §10(b) claim," without any explanation as to what the additional testimony consists of, or how it supports their claims. Thus, the few specific arguments Plaintiffs do raise fail to show that the proposed amendments were important, and Plaintiffs have otherwise failed to sufficiently brief this issue. *See* FED. R. APP. P. 28(a)(8) (briefing "must contain . . . appellant's contentions and the reasons for them, with citations to" supporting authority). Inadequately briefed arguments are generally deemed to have been forfeited, *see, e.g.*, *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017), and we see no reason to deviate from the usual rule here.

Plaintiffs have failed to demonstrate that they were diligent in pursuing their amendments or that these amendments were important. Accordingly, even assuming that the other two factors favor the Plaintiffs, the district court did not abuse its discretion by denying leave to amend. *See Fahim*, 551 F.3d at 348 (no abuse of discretion in denial of leave to amend where two factors "weighed heavily against" amendment and two factors weighed in favor).

**\*\*\***

For these reasons, we AFFIRM the district court's denial of leave to amend as well as its dismissal of Plaintiffs' first amended complaint.