# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 3, 2025

Lyle W. Cayce
Clerk

————————

No. 24-20326

————————

Nova Scotia Health Employees' Pension Plan,

*Movant—Appellant/Cross-Appellee*,

*versus*

McDermott International, Incorporated; David Dickson; Stuart Spence,

*Defendants—Appellees/Cross-Appellants*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-4330

_____

Before Wiener, Willett, and Ho[1], *Circuit Judges*.
Jacques L. Wiener, Jr., *Circuit Judge*:[*]

This appeal arises from an interlocutory order partially granting and partially denying class certification and the procedural posture from which that order arose. Plaintiff-Appellant Nova Scotia Health Employees' Pension Plan (NSHEPP) appeals the classification order, contesting the district court's ability to withdraw its first order denying certification and to issue the

---

[1] Judge Ho concurs in the judgment only.

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-20326

one that is the subject of this appeal. NSHEPP also appeals various findings in the certification order. Defendants McDermott International (McDermott), David Dickson, and Stuart Spence (collectively, defendants) cross-appealed the district court's holding on standing and that court's other holdings in connection with its partial grant of class certification. We AFFIRM.

I.

## A. Factual Background

This is a § 10(b) securities fraud class action filed pursuant to the Private Securities Litigation Reform Act (PSLRA) on behalf of purchasers of McDermott common stock. *Edwards v. McDermott Int'l, Inc.*, No.4:18-cv-4330, 2021 WL 1421609, at *1 (S.D. Tex. Apr. 13, 2021). NSHEPP is the lead plaintiff and its counsel is Pomerantz LLP (Pomerantz). Defendants are McDermott, its former CEO David Dickson, and its former CFO Stuart Spence. As with any complex class action sprawling across many years, this case has a lengthy history, which the district court recounted in its denial of defendants' motion to dismiss. *See Edwards*, 2021 WL 1421609, at *1–6. We therefore limit our discussion to the relevant factual background that is pertinent to the issues on appeal.

The underlying fraud allegations concern the 2018 merger between McDermott, an upstream offshore development company, and Chicago Bridge & Iron Company (CB&I), a downstream engineering and construction company. After merging, CB&I ceased to exist and became a part of the new McDermott entity. CB&I stockholders received 0.82407 shares of McDermott stock in exchange for every one share of CB&I stock they held pre-merger. Pre-existing McDermott stockholders became the owners of about 53% of the new entity and former CB&I stockholders became the owners of about 47%. The merger was pitched as an opportunity for McDermott to diversify its holdings and form a vertically integrated,

2

No. 24-20326

downstream-upstream company, while offering the struggling CB&I an alternative to bankruptcy.

At the time of the merger, NSHEPP held 30,400 shares of CB&I common stock in its portfolio, which were converted into 25,051 shares of McDermott stock on the merger's completion. NSHEPP did *not* purchase McDermott stock on the open market or otherwise, acquiring all of its McDermott shares in this single exchange transaction.

The merger was announced on December 18, 2017, with due diligence occurring in the leadup and following that announcement. *Id.* at *3. The merger closed on May 10, 2018, and—despite defendants' continued optimism[2]—McDermott reported quarterly loss after quarterly loss until it filed for Chapter 11 bankruptcy on January 21, 2020. *Id.* at *4–5. Between the date of the merger announcement and September 2019, McDermott stock plummeted by 92.5%, wiping out essentially all value for NSHEPP and other McDermott stockholders.

## B. Procedural Background[3]

The PSLRA requires that the trial court "adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is

---

[2] When it denied defendants' motion to dismiss, the court excerpted quotes from McDermott's filings which said that cost overruns were "within the bounds of the scenarios [McDermott] contemplated during [its] due diligence," that McDermott "expect[ed] no further material changes in the cost estimates," and that McDermott "expect[ed] to see a sharp improvement" in its income. *See Edwards*, 2021 WL 1421609, at *4–5 (quoting from McDermott 8-Ks between July 31, 2018 and July 30, 2019).

[3] The initial class action complaint was filed on November 15, 2018 (styled *Miriam Edwards v. McDermott*) alleging § 10(b) and § 20(a) claims under the Securities Exchange Act of 1934. A few months later, another class action was filed, alleging § 14(a) and § 20(a) claims (styled *Public Employees' Retirement System of Mississippi v. McDermott*). These actions were consolidated on June 4, 2019, even though they are proceeding along different

the person or group of persons that . . . has the largest financial interest in the relief sought by the class" and who also meets the requirements of Fed. R. Civ. P. 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The court appointed NSHEPP as lead plaintiff for the § 10(b) claims and approved NSHEPP's selection of Pomerantz as its counsel after the other applicants withdrew from consideration. The PLSRA also imposes a heightened pleading requirement, requiring that the plaintiff survive a motion to dismiss before discovery can begin. § 78u-4(b)(2), (b)(3)(B). NSHEPP survived this threshold requirement, and discovery commenced in April 2021. *Edwards*, 2021 WL 1421609, at *10.

In the operative complaint, NSHEPP alleged that McDermott, Dickson, and Spence made misleading or untrue statements of material fact that caused McDermott's shares to be inflated at the time of the merger, and that, on the release of subsequent corrective disclosures, McDermott's stock price fell and resulted in economic damage to NSHEPP and other McDermott stockholders. The alleged fraud itself centered around the pre-merger economic health of CB&I caused by cost overruns in two gas turbine projects and two liquefied natural gas projects. Collectively, these four "Focus Projects" were severely straining CB&I. In early 2018, "CB&I reported a net loss of $1.5 billion for the full year of 2017." *Id.* at *3 (citing CB&I Form 8-K, Feb. 20, 2018). By contrast, "CB&I had reported a net loss of $313.2 million in 2016." *Id.* According to NSHEPP, the "CB&I/Focus Project Fraud involved [d]efendants' misstating the benefits of the [m]erger by concealing the substantially higher undisclosed costs that the Focus Projects were internally forecast to incur . . . while simultaneously misrepresenting the true and ongoing costs of these delayed and over-budget

---

certification paths, given the difference between §§ 10(b) and 14(a) claims. This appeal involves only the § 10(b) suit.

projects, the risks they posed, and the benefits and synergies to McDermott."

NSHEPP filed its motion for class certification pursuant to Fed. R. Civ. P. 23(b)(3), seeking certification of the following class:

> All persons and entities (the "§ 10(b) Class members") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and January 23, 2020, both dates inclusive ("10(b) Class Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5. Excluded from the § 10(b) Class are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.

NSHEPP urged the district court to select it as class representative and to select Pomerantz as lead counsel, along with the Briscoe Law Firm as liaison counsel.

The district court had referred all non-dispositive pretrial matters to a magistrate judge. This included the motion to certify. On February 29, 2024, the magistrate judge issued his memorandum and recommendation (MR-1[4]). *Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-04330, 2024 WL 873054, at *1 (S.D. Tex. Feb. 29, 2024). In MR-1, the magistrate judge denied the motion to certify the class, without prejudice to refile, because he

---

[4] NSHEPP's briefing refers to this as "MR-1," and defendants refer to it as "Original M&R." In this opinion, we refer to it as MR-1, and use this nomenclature to refer to the subsequent Memorandum and Recommendation (MR-2), as well as the district court's orders adopting these MRs (OR-1 and OR-2 respectively).

identified a "fundamental conflict" between class members who purchased McDermott stock on the open market (purchasers) and class members, like NSHEPP, who only obtained McDermott stock because they held CB&I stock that was converted in the merger (exchangers). *Id.* at *12–13.

The conflict exists, reasoned the magistrate judge, because the fraud NSHEPP itself alleges could have inured to the exchangers' benefit. The magistrate judge explained that "common sense and the near-lockstep movement of CB&I's and McDermott's stock leading up to the [m]erger suggest that CB&I's shares were worth $16.39 apiece *only because of the fraud that Plaintiffs are alleging.* Unlike the inflation in McDermott's stock, which unquestionably harmed all class members, the inflation in CB&I's stock prior to the [m]erger was a *benefit* to CB&I shareholders." *Id.* at *9 (emphasis in original). "When CB&I shareholders 'took money out of their pocket to acquire new McDermott shares,' they had more money in their pockets because the alleged fraud had inflated CB&I's stock." *Id.* (citation omitted). This conflict rendered NSHEPP an inadequate class representative for the class it had defined in its motion. *Id.* The magistrate judge proposed dividing the class into two subclasses: One for exchangers and one for purchasers. *Id.* at *21–22. It also made certain determinations on substantive issues, holding that (1) NSHEPP had standing, and (2) the market for McDermott shares was efficient after September 7, 2019 through the Class Period. *Id.* at *22.

The following timeframe is important to this appeal. On March 23, 2024, the district court adopted MR-1 with only small modifications (OR-1). *Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-04330, 2024 WL 1256293, at *1 (S.D. Tex. Mar. 23, 2024) (disagreeing with MR-1's conclusion that NSHEPP could adequately represent a class that includes exchangers *and* class members who are both exchangers and purchasers). On April 8, 2024, NSHEPP filed a timely Rule 23(f) petition, seeking appellate review of the

class certification denial in OR-1. On April 10, the magistrate judge held a status conference to discuss the next procedural steps in light of the district court's adoption of MR-1 and the denial of class certification at that juncture. At that status conference, it became evident to the magistrate judge that the parties misunderstood the certification order.

So, on April 24, the district judge withdrew his order (OR-1) because the magistrate judge had informed the court that he "would like to revise his February 29, 2024 memorandum and recommendation to address some issues that became apparent following his most recent conference with the parties." That same day, the magistrate judge issued his revised memorandum and recommendations (MR-2). *Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-04330, 2024 WL 1769325, at *1 (S.D. Tex. Apr. 24, 2024). The district court adopted MR-2 on June 21 with minor modifications (OR-2). *Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-04330, 2024 WL 3085177, at *1 (S.D. Tex. June 21, 2024) (fixing a footnote and striking a clause referring to plaintiffs' damages burden as an affirmative defense).

MR-2 maintained the fundamental conflict holding but concluded that enough existed in the record to support NSHEPP's adequacy to represent the exchanger subclass. 2024 WL 1769325, at *14–15. But because NSHEPP is inadequate to represent the purchaser subclass, a purchaser lead plaintiff and purchaser lead counsel would have to be appointed, even though MR-2 provided that any class members who are *both* purchasers *and* exchangers "will hold claims in both classes." *Id.* at *15. MR-2 maintained MR-1's holdings on NSHEPP's standing. *Id.* at *6–8. But it held that "[d]efendants' remaining arguments against class certification regarding market efficiency after September 19, 2019, and the correctiveness of the last five alleged corrective disclosures, pertain to a period in time that is relevant only to actual purchasers of McDermott stock[,]" not to exchangers like NSHEPP. *Id.* at *14. The magistrate judge thus recommended that the district court

"defer consideration of these arguments until a lead plaintiff for a putative class of purchasers" is appointed and moves for certification. *Id.* After the district court adopted MR-2 (with the two small modifications), we denied the Rule 23(f) petition that NSHEPP had filed, contesting OR-1/MR-1. NSHEPP then timely filed the instant appeal in the form of a new Rule 23(f) petition, and we granted permission to proceed.

So here we are: NSHEPP insists that the district court lacked authority to withdraw and reissue the order because that conduct occurred after NSHEPP filed its first 23(f) petition, which NSHEPP says deprived the district court of jurisdiction over the case. NSHEPP also appeals that withdrawal and reissuance on grounds that it conflicts with Fifth Circuit precedent. NSHEPP then raises several additional matters on appeal. It contests: (1) the holding that a fundamental conflict exists; (2) OR-2's reframing of the damages burden from an affirmative defense to one that the plaintiffs must bear; and (3) the reopening of the PLSRA lead plaintiff (and lead counsel) process for the purchaser subclass. Defendants filed their own Rule 23(f) petition/cross-appeal, seeking review of OR-2 on more limited ground, contesting (1) the standing holding; (2) the certification of any class or subclass that contains *both* purchasers *and* exchangers; and (3) whether NSHEPP can appeal issues related to the withdrawal/reissue if those issues do not relate to class certification (such as market efficiency and the affirmative defense clause).

## II.

The district court had jurisdiction over this securities class action under 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §§ 78aa. Federal Rule of Civil Procedure 23(f) states that a court of appeals may permit an appeal from an order granting or denying class certification, treating such as an appeal of an interlocutory order. "An appeal does not stay

proceedings in the district court unless the district judge or the court of appeals so orders." Fed. R. Civ. P. 23(f). The parties timely filed their Rule 23(f) petitions seeking permission to appeal OR-2, an order granting class certification in part and denying it in part, and we granted permission to proceed with the appeal.

NSHEPP's first issue on appeal concerns the district court's jurisdiction to modify its order because that modification occurred after NSHEPP filed its first Rule 23(f) petition (appealing OR-1). We review a "district court's legal determination that it possessed subject matter jurisdiction *de novo*." *Allstate Fire & Cas. Ins. Co. v. Love*, 71 F.4th 348, 351 (5th Cir. 2023); *Passmore v. Baylor Health Care Sys.*, 823 F.3d 292, 295 (5th Cir. 2016) ("[W]e must satisfy ourselves that the district court had jurisdiction to decide the case and that this court has jurisdiction to consider the appeal.").

Thankfully, this issue is easily resolved. Unlike the filing of a notice of appeal on final judgment, which divests a district court of jurisdiction over the case, *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam), the filing of a Rule 23(f) petition is functionally a request for permission to appeal. *See* Fed. R. Civ. P. 23(f) ("A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule . . . . An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders."); Fed. R. App. P. 5(d)(2) ("A notice of appeal need not be filed. The date when the order granting permission to appeal is entered serves as the date of the notice of appeal for calculating time under these rules."). In general, "[a]s long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (quoting *Melancon v.*

*Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981) (emphasis omitted)); *see also id.* (collecting cases from different circuits stating the same general rule).

We have treated Rule 23(f) petitions as appeals by permission under Federal Rule of Appellate Procedure 5. *See, e.g.*, *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 520 (5th Cir. 2002); *Harper v. Am. Airlines, Inc.*, 371 F. App'x 511, 512 (5th Cir. 2010) (per curiam). Accordingly, a district court does not lose jurisdiction over a case when a party files a Rule 23(f) petition, but rather on our grant of the petition, which allows the appeal to proceed. *See* FED. R. APP. P. 5(d)(2) ("The date when the order granting permission to appeal is entered serves as the date of the notice of appeal for calculating time under these rules."). Courts in other circuits have held the same. *See, e.g.*, *City of Los Angeles*, 254 F.3d at 886 ("Here, we did not issue an order granting [the parties] permission to bring an interlocutory appeal—and thus did not divest the district court of jurisdiction over the issues to be raised in the interlocutory appeal—until February 29, 2000. Accordingly, the district court was free to exercise its 'inherent procedural power' to rescind its October 28 certification order at any time prior to that date."); *Ortiz v. Saba Univ. Sch. of Med.*, 348 F.R.D. 4, 9 (D. Mass. 2024); *Kaplan v. Saint Peter's Healthcare Sys.*, No. 13-2941, 2014 WL 7051871, at *2 (D.N.J. Dec. 12, 2014). The district court had jurisdiction to rescind OR-1 because, when it rescinded the order, we had not yet ruled on the Rule 23(f) petition.

## III.

We review class-certification decisions for abuse of discretion. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129 (5th Cir. 2005); *see In re Deepwater Horizon*, 739 F.3d 790, 812–13 (5th Cir. 2014). "Whether the district court applied the correct legal standard in reaching its decision on class certification, however, is a legal question that we review de novo." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (quoting *Allison v.*

No. 24-20326

*Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998)); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) ("A district court that premises its legal analysis on an erroneous understanding of the governing law has abused its discretion."). Standing is reviewed de novo. *Earl v. Boeing Co.*, 53 F.4th 897, 901 (5th Cir. 2022).

IV.

After dispensing with the jurisdictional question, the remaining issues in the appeal and cross-appeal are whether:[5] (1) the district court ran afoul of binding precedent by modifying the order; (2) the district court erred in holding that NSHEPP has standing; (3) the fundamental conflict determination was error; (4) the court erred by ordering the appointment of a new lead plaintiff and new lead counsel for the purchaser subclass (and whether subclassing itself was error); (5) purchasers and exchangers could ever be in the same class without an intraclass conflict; and (6) appellate review of the certification order is limited to only matters concerning class certification; and (7) the affirmative defense language falls within this category. We address each of these issues.

At the outset, however, we briefly dispense with NSHEPP's forfeiture contention. NSHEPP insists that McDermott forfeited its arguments regarding intraclass conflict (implicating ascertainability and superiority) by failing to raise them until its objections to MR-2. NSHEPP is correct that arguments not raised before objections to a memorandum and recommendation are forfeited before the district court, and thus forfeited at the appellate level. *United States v. Armstrong*, 951 F.2d 626, 630 (5th Cir.

---

[5] We do not distinguish between primary appeal issues raised by NSHEPP and cross-appeal issues raised by McDermott. Instead, we address the issues in the order that we find makes the most logical and analytical sense.

1992). But that is not what happened here. It was the magistrate judge who, sua sponte, raised the conflict in MR-2. *See Edwards*, 2024 WL 1769325, at * 8–12. McDermott then addressed them at its first opportunity—in its objections to MR-2. McDermott thus did not forfeit any arguments.

## A.

NSHEPP first asserts that, even if jurisdiction exists, the district court erred when it withdrew and reissued the certification order because "binding precedent" bars a district court and appellate court from jointly exercising jurisdiction over the same case. In its brief, NSHEPP repeatedly uses some variation of the phrase "no change in the law or facts" to assert that the modification was improper. NSHEPP's only citation for this assertion is a letter that NSHEPP itself sent to the court when it withdrew OR-1 and issued MR-2.

In that letter, NSHEPP cited to two cases that it characterized as "binding precedent." But the first case, *Glover v. Standard Federal Bank*, was an unpublished district court opinion out of Minnesota. No. 972068, 2001 WL 34635707 (D. Minn. June 11, 2001). *Glover* is not only not binding, but the portion to which NSHEPP cites is also inapposite: in that case, the Rule 23(f) petition had been granted. *Id.* at *1–2. Here, the petition had not yet been granted but was still pending. The other case NSHEPP relies on is *Dayton Independent School District v. U.S. Mineral Products Co.*, 906 F.2d 1059 (5th Cir. 1990). The language NSHEPP points to discusses the same principle: "A 'federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously.'" *Id.* at 1063 (quoting *Griggs*, 459 U.S. at 58). But NSHEPP ignores the following paragraph, which states that the court is "bound by [its] well-established rulings that the district court loses jurisdiction over all matters which are *validly on appeal*." *Id.* at 1064 (emphasis added). Because we had not yet ruled

on the Rule 23(f) petition at the time when the district court modified its orders, the matter was not validly on appeal, and *Dayton* is unhelpful.[6] In any event, Federal Rule of Civil Procedure 54(b) permits a district court to "reconsider and reverse" interlocutory orders "for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994)).

In fact, binding caselaw permits, and Rule 23 itself contemplates, modifications to class-certification orders. *E.g.*, *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1350 (5th Cir. 1985) ("It is well-settled that decisions on class certification are always interlocutory."); *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts."); *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."); FED. R. CIV. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). The district court did not err when it modified its certification order.

---

[6] NSHEPP's opening brief also cites *Wooten v. Roach*, 964 F.3d 395, 403 (5th Cir. 2020) for the proposition that district courts "should not attempt to assert jurisdiction over a case simultaneously" with the appellate court. But that case is likewise inapposite. It dealt with an interlocutory appeal of an immunity decision, which—unlike Rule 23(f) petitions—are not treated as appeals by permission. *See Johnson v. Jones*, 515 U.S. 304, 309–10 (1995) (discussing qualified immunity appeals as standard appeals from final district court decisions under 28 U.S.C. § 1291).

B.

We treat standing as "an inherent prerequisite to the class certification inquiry" that "must [] be addressed even under the limits of a rule 23(f) appeal." *Earl*, 53 F.4th at 901 (quoting *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002)). Defendants maintain that NSHEPP suffered no injury-in-fact because, as an exchanger, they *only* benefited—and were not harmed—when their CB&I stock was converted into McDermott stock. They point to *Earl v. Boeing* when they contend that NSHEPP "offered no plausible theory of economic harm." *Edwards*, 2024 WL 1769325, at *7 (quoting *Earl*, 53 F.4th at 903). In response, the court acknowledged that "[i]t is too early to say whether former CB&I shareholders derived a net economic benefit from the alleged fraud," and that "[n]obody has quantified the inflationary effect on CB&I stock." *Id.* at *11 (citation modified). Because the inflationary relationship between McDermott stock and CB&I stock is an open question, it is possible that exchangers like NSHEPP can show they suffered an economic injury. *Id.* The court reasoned that "[t]his possibility is why [NSHEPP] has standing." *Id.*

McDermott's retort is that it is logically impossible for exchangers to have suffered an injury in this context. It explains that NSHEPP's theory of fraud—which centers on pre-merger conduct at CB&I—requires the conclusion that any McDermott inflation must be attributable solely to CB&I inflation that was then incorporated into McDermott stock prices. It would be impossible, the argument goes, for McDermott inflation to exceed CB&I inflation because, prior to the merger, McDermott was a healthy and profitable company with no inflation, and NSHEPP's theory of fraud makes no allegation otherwise. Therefore, if only CB&I stock was inflated, any McDermott inflation post-merger-announcement (and post-merger) must have been the sole result of CB&I inflation and therefore cannot exceed it.

This argument is attractive in its simplistic framing, and it might be true if there were evidence to support it. But there is no such evidence at this point in the litigation, and the court explained that the respective levels of inflation "will ultimately be decided by the trier of fact." *Id.* ("Nobody has quantified the inflationary effect on CB&I stock." (citation modified)).

One last point. Standing requires that the injury be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The standing analysis in MR-2 is sparse on caselaw and heavy on the record. *See Edwards*, 2024 WL 1769325, at *6–8; *see also Edwards*, 2024 WL 873054, at *7–9 (MR-1, with the same analysis). The court rested on *Earl v. Boeing*, concluding that—unlike the plaintiffs there who offered "no plausible theory of economic harm"—NSHEPP here does assert a plausible theory: Defendants' misrepresentations inflated McDermott's stock price—above any CB&I inflation that had been incorporated—and, when the misrepresentations were revealed, the price fell and caused economic damage to NSHEPP. *Edwards*, 2024 WL 1769325, at *7. *Compare id.*, *with*, *Earl*, 53 F.4th at 903 (holding that the plaintiffs' injury theory rested on the "unsupportable inferences" that airlines would have continued offering Boeing MAX 8 flights, despite public knowledge of their defects, and also that they would be doing so for lower prices—both of which the court found "implausible").

Even if we were to construe defendants' position as alleging that this is too speculative a theory of injury, caselaw finding injuries too speculative tend to focus on future injuries or fears, or injuries that are "premised on a speculative chain of possibilities." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). The theory of harm here is not about a future harm or premised on a tenuous possibility, but turns entirely on the respective amount of inflation between CB&I and McDermott stock in the Class Period. Without evidence of that respective inflation, and with NSHEPP's

pleading a plausible theory of economic harm, we agree that NSHEPP has standing.

## C.

We review the district court's holding on the fundamental conflict for abuse of discretion. *Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 380 (5th Cir. 2007) ("We review class certification decisions for an abuse of discretion in recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." (quotation marks omitted)). NSHEPP asserts that the court erred when it determined that a fundamental conflict exists between exchangers and purchasers. Defendants agree that a fundamental conflict exists between exchangers and purchasers, but contend that the court erred when it determined that class members who are *both* exchangers *and* purchasers can hold claims in both subclasses because—according to defendants—that would still implicate the conflict.

To certify a class action, Rule 23 requires that a class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).[7] "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Certification is proper only where 'the trial court is satisfied, after a *rigorous analysis*,' that the Rule's requirements are met." *Chavez v. Plan Benefit*

---

[7] The four prerequisites laid out in Rule 23(a) are numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a)(1)–(4). The Rule then sets out three forms of class actions that have additional requirements. In this case, the suit proceeded under Rule 23(b)(3), which imposes two additional requirements—predominance and superiority. In this opinion, we discuss only the prerequisites that are contested on appeal.

*Servs., Inc.*, 957 F.3d 542, 545 (5th Cir. 2020) (quoting *Dukes*, 564 U.S. at 350–51) (emphasis in original). Part of the adequacy analysis requires a court to "uncover[] 'conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314–15 (5th Cir. 2007) (quoting *Berger*, 257 F.3d at 479–80). "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefited other members in the class." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). "A conflict is not fundamental when . . . all class members share common objectives and the same factual and legal positions and have the same interest in establishing the liability of defendants." *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (cleaned up).

The magistrate judge found a fundamental intraclass conflict because "it [] is possible that CB&I's stock was more inflated than McDermott's stock, and that former CB&I shareholders derived a net economic benefit from exchanging their shares." *Edwards*, 2024 WL 1769325, at *11. Although the magistrate judge observed that the motion to certify "is not the time to litigate these issues," precedent requires the court to "consider how a trial on the merits would be conducted if the class was certified." *Id.* (citing *Prantil v. Arkema Inc.*, 986 F.3d 570, 574 (5th Cir. 2021)). The magistrate judge reasoned that this conflict between exchangers and purchasers was fundamental because "[t]he inflationary effect of the alleged fraud on CB&I's stock simply does not concern purchasers of McDermott stock," and it would be "fundamentally unfair for absent class members who actually purchased McDermott stock to be represented by [NSHEPP] and its counsel, who may yet expend considerable time—as they did during the class certification hearing—on the issue." *Id.*

Importantly, when a court analyzes adequacy and determines that a fundamental conflict exists, that conflict is between the class representative

and other members of the class it represents—as opposed to conflicts among unnamed class members themselves—but we acknowledge that some cases are unclear on this point. *Compare Berger*, 257 F.3d at 479–80 ("The adequacy inquiry also serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." (citation modified)), *with Langbecker*, 476 F.3d at 315 ("Substantial conflicts exist *among the class members*, raising questions about the adequacy of the lead Plaintiffs' ability to represent the class." (emphasis added)). But the core adequacy inquiry is whether "the *representative* parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4) (emphasis added).

Here, the court did not abuse its discretion when it found a fundamental conflict between purchasers and exchangers. The magistrate judge reasoned that this issue of comparative inflation would only impact exchangers because purchasers do not have any reason to care about the CB&I stock inflation, and NSHEPP's exchanger role will require it to spend a lot of time briefing and arguing issues related to CB&I inflation that would do little to nothing to vindicate the interests of purchasers.[8] *Edwards*,

---

[8] In some securities fraud cases, courts characterize purported conflicts involving "the amount of price inflation" as an issue "primarily with respect to damages" and thus not enough to defeat adequacy. *See In re Miller Indus., Inc. Sec. Litig.*, 186 F.R.D. 680, 686–87 (N.D. Ga. 1999) (collecting cases). In *In re Miller*, the defendants attempted to defeat adequacy by arguing conflicts existed between class members who (1) held shares versus sold shares at certain points in the class period, (2) sold shares versus those who purchased shares, and (3) purchased early versus purchased late in the class period. *Id.* The court disagreed that any of these were fundamental conflicts, noting that "[a]ny such conflicts are largely peripheral to the main class issues of proving misrepresentations, scienter, materiality and causation." *Id.* at 687.

As applicable to the instant case, the conflict between exchangers and purchasers—such as whether one class member received a net benefit while another was harmed—could perhaps be resolved when administering damage awards by, for instance, offsetting exchangers' recovery, and may not impact the common items like "proving misrepresentations, scienter, materiality, and causation." *See id.* On the other hand, we

2024 WL 1769325, at *11. Hence, the court's decision to create the two subclasses. *Id.*; *see also id.* at *10 (noting that NSHEPP is not unique in its exchanger role because, post-merger, about half of the new McDermott entity was owned by CB&I exchangers while the other half was owned by prior-McDermott shareholders). The court reasoned that if half the class are exchangers and half are purchasers, two subclasses would be the best way to resolve the conflict so that a significant part of a merits trial is not focused on an issue of importance to only half the class. *Id.* at *11–12. Similarly, the court reasoned that certain issues would be only relevant to purchasers, such as post-merger market efficiency and the "correctiveness of the last five alleged corrective disclosures," which occurred post-merger. *Id.* at *14; *see also Sharp Farms v. Speaks*, 917 F.3d 276, 297 (4th Cir. 2019) (finding a fundamental conflict when one group of class members were "pursuing different legal claims" reflecting "different theories of the case" than the other group).

## D.

The fundamental conflict conclusion above implicates the following issues on appeal: (1) whether the court erred in resolving the conflict by creating subclasses[9] and in reopening the lead plaintiff/lead counsel process

_____

cannot say that the court abused its discretion when it determined that NSHEPP will have to conduct their trial by focusing on certain issues that are necessary for exchangers' success, but that are simply irrelevant to purchasers, and vice versa. *See Edwards*, 2024 WL 1769325, at *14; *Prantil*, 986 F.3d at 574 (requiring courts to consider how a trial on the merits would be conducted if the class were certified).

[9] In our view, the subclassing here is more properly considered in the context of certification, rather than the context of case management decisions. *See Casale v. Kelly*, 257 F.R.D. 396, 408–09 (S.D.N.Y. 2009) ("Case-management subclasses are an appropriate procedural innovation under Rule 23(d), when there is no actual conflict among class members in the underlying claims common to the entire class." (quotation marks and citations omitted)).

for the purchaser subclass; and (2) whether it erred in concluding that class members who are *both* purchasers *and* exchangers may hold claims in both classes.

When a court identifies a fundamental conflict, it may or may not determine that subclassing is the best way to resolve such a conflict. FED. R. CIV. P. 23(c)(5) (permitting subclassing); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 918 (E.D. La. 2012), *aff'd In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ("Subclassing is but one of many available options for limiting the possibility of intraclass conflicts; it is not required as a matter of course. Rather, subclasses might only be needed when there is a 'fundamental' conflict among class members."); *see also* 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:31 (6th ed. 2025) (recognizing other paths to resolve conflicts, such as bifurcating liability and damages trials or decertifying after the liability trial); *Edwards*, 2024 WL 1769325, at *11 (citing and quoting § 7:31). The magistrate judge's reasoning on this matter was admittedly brief: It only stated that subclassing was preferable to bifurcation in this case because "the possible lack of damages or benefit to Nova Scotia goes to [d]efendants' liability." *Edwards*, 2024 WL 1769325, at *11.

As part of the certification inquiry, we review this subclassing determination for abuse of discretion. *See In re Deepwater Horizon*, 739 F.3d at 814. The magistrate judge applied the correct legal standard in making this determination by conducting his own rigorous analysis into the certification requirements and in considering how a merits trial would be conducted if the class were certified. Further, Rule 23 expressly permits subclassing, and cases in this circuit have considered subclassing an appropriate way to resolve a fundamental conflict. *In re Oil Spill*, 910 F. Supp. 2d at 918–19; FED. R. CIV. P. 23(c)(5). This is why we disagree with NSHEPP's contention that the court erred when it rejected the proposed bifurcation alternative. Under

an abuse of discretion standard, is not the job of an appellate court to second guess "a district court's reasonable inferences when they are rooted in record evidence." *In re TikTok, Inc.*, 85 F.4th 352, 360 (5th Cir. 2023). The court did not abuse its discretion when it determined, based on the evidence before it, that subclassing was the most appropriate path to resolve the conflict it identified.

However, we must also address whether the court abused its discretion in holding that class members who are *both* purchasers *and* exchangers can hold claims in both classes. Defendants maintain that the fundamental conflict multiplies if the court allows class members who are both exchangers and purchasers—that is, someone who both held CB&I stock that was converted in the merger, *and* who also went out on the open market during the Class Period to purchase McDermott stock—to hold claims in both classes. We disagree.

The conflict analysis is part of the adequacy element of a class action, and adequacy concerns the class representative, not every single unnamed class member. *See* Fed. R. Civ. P. 23(a)(4) ("[T]he *representative parties* will fairly and adequately protect the interests of the class." (emphasis added)). Of course, "each subclass [must be] homogeneous, in the sense that every member of the subclass wants the same relief." *Johnson v. Meriter Health Servs. Emp. Retirement Plan*, 702 F.3d 364, 368 (7th Cir. 2012).

We shall use an imaginary investor, John Doe. Assume that Doe was both an exchanger and a purchaser. Doe therefore has two interests that he wants adequately represented in this class action: (1) he wants damages in connection with his exchanged shares and, to further that interest, he wants NSHEPP to prove minimal inflation in CB&I stock and maximum inflation in McDermott stock (to maximize the difference and thus his damages); and (2) he wants the purchaser subclass's lead plaintiff to prove that defendants'

misrepresentations fraudulently inflated McDermott stock price so he can recover the difference between his purchase price and the price it should have been priced at but for the misrepresentations. NSHEPP will adequately represent his exchanger interest—maybe trial proves he has a net negative; maybe it proves he has a net benefit—but, either way, NSHEPP will be protecting his exchanger interest and will fight to maximize his exchanger recovery because NSHEPP itself wants maximum recovery under this theory. The purchaser lead plaintiff will then protect Doe's purchaser interest by bringing its strongest fraud-on-the-market case—again, because that lead plaintiff itself will be incentivized to maximize its own recovery as a purchaser. We see no logical reason why Doe cannot recover with respect to both of these separate interests—any conflict between purchasers and exchangers from a class-representative standpoint does not to trickle down to unnamed class members seeking only their own personal damages.

The Second Circuit has held as much, explaining that even when "some class members would fall into more than one subclass, we can see no reason why that would be fatal to such a structure*." In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 257 (2d Cir. 2011). As played out above with John Doe, "[a]ll class members are interested in receiving the maximum possible recovery for their claims. Having a separate subclass representative advocate exclusively for each of those claims is the most effective means of achieving that result." *Id.* ("A plaintiff who holds claims in Categories B and C would, for example, be represented by different subclass representatives and counsel with respect to each category. Each subclass representative would, in turn, represent plaintiffs' interests with respect to only that category of claim."); *see also Vodanovich v. BOH Bros. Constr. Co., LLC*, No. 05-4191, 2013 WL 1155219, at *5 (E.D. La. Mar. 19, 2013) ("A Class Member who falls within these areas of overlap will be included in more than one Subclass. A Class Member may also otherwise be

included in more than one Subclass; however, no Class Member who is not in a particular Subclass shall be entitled to be paid from the funds available to that Subclass.").

The fact that the pool for recovery is limited does not change this analysis. Each subclass will have its chosen fighter who will bring his best legal case on behalf of the subclass he represents. The parties do not identify, nor can we find, a single case that mandates full and complete recovery for every subclass in a class action involving a limited pool of resources. All that is required is that each subclass has a representative that will "fairly and adequately represent protect the interests of the [sub]class." Fed. R. Civ. P. 23(a)(4). Having unnamed class members hold claims in both the exchanger and purchaser subclasses does not implicate, let alone multiply, any conflict.

## E.

Finally, we address whether the court's revisions in MR-2 are beyond the scope of a Rule 23(f) petition. Defendants insist that NSHEPP cannot appeal findings that are irrelevant to the certification decision. They cite to *Regents of University of California v. Credit Suisse First Boston (USA), Inc.* and allege that "the sole order that may be appealed is the class certification; 'no other issues may be raised.'" 482 F.3d at 380 (quoting *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 314 (5th Cir. 2005)). Defendants would have the following issues on appeal fall into this non-reviewable bucket: (1) the court's revisions in general; (2) the reopening of the lead plaintiff process; (3) "deferring resolution of certain issues" for the purchaser lead plaintiff (such as findings on post-merger market efficiency and the correctiveness of certain disclosures); and (4) the striking of the "affirmative defense" clause from MR-2. In our view, the lead plaintiff process falls outside of Rule 23(f)'s

scope of review, and we can resolve the other issues without reaching whether Rule 23(f) forecloses them as separate from the certification order.

The methods a court employs in its management of the lead plaintiff process, including its decision to open or re-open the selection process, are case management decisions and therefore "not proper subjects for Rule 23(f) review." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004); *see also In re NYSE Specialists Secs. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007) (collecting cases that "acknowledged the ability to consider motions to disqualify, remove, withdraw, substitute, and add lead plaintiffs throughout the litigation of a securities class action."); 7 Newberg and Rubenstein on Class Actions § 22:46 (6th ed. 2025) ("Given the lack of statutory guidance on replacement lead plaintiff, the processes for addressing the question lie squarely within a trial judge's discretion, may vary according to the facts of the case, and will rarely be subjects for reversal on appeal."). Under Rule 23(f), we may only consider Rule 23's certification requirements and "findings made in connection with those requirements." *Credit Suisse*, 482 F.3d at 381 (quotation omitted). This issue exceeds the scope of our 23(f) review. *Id.*

Turning to the remaining issues, we have held that the court was well within its jurisdiction, and did not abuse its discretion, when it modified its first certification order (MR-1 and OR-1). Those modifications included the revisions striking the affirmative defense clause and the revisions that withdrew findings on market efficiency. We therefore need not decide whether or not those matters are appropriate for Rule 23(f) review.

AFFIRMED.